COURT OF APPEALS OF VIRGINIA

Present:   Judges Raphael, White and Senior Judge Petty
Argued at Richmond, Virginia

UNPUBLISHED

PAUL H. LUNDMARK

MEMORANDUM OPINION* BY
v.        Record No. 0677-21-2                    JUDGE STUART A. RAPHAEL
                                                  AUGUST 1, 2023
COUNTY OF HENRICO


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Jr., Judge

Paul C. Galanides for appellant.

(Alexandra Maher, Assistant Commonwealth's Attorney, on brief),
for appellee.  Appellee submitting on brief.


Paul H. Lundmark appeals his conviction for driving under the influence of alcohol.  He

argues that his nine-second failure to move forward when the traffic light turned green did not

give the officer reasonable suspicion to detain him.  He also claims that the trial court should

have excluded the breathalyzer results because the officer did not first confirm that Lundmark

had nothing in his mouth before administering the test.  Finding no error, we affirm.

BACKGROUND[1]

At 11:06 p.m. on October 12, 2019, Henrico County Police Sergeant Joseph D. Butcher

was driving in his marked police cruiser along Three Chopt Road in Henrico County.  As he got

within eyesight of the intersection with Pump Road, the traffic light on Three Chopt Road turned

from red to green.  Butcher noticed Lundmark's vehicle in the same travel lane ahead of him,

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Consistent with the applicable standard of review, we recite the facts in the light most
favorable to the Commonwealth.  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022).

stopped at the intersection. Despite having a green light, Lundmark's car remained stopped, its brake lights illuminated. As Butcher arrived at the intersection, Lundmark's car finally moved forward. Butcher estimated that Lundmark had remained stopped at the green light for nine seconds.[2] His body-camera video showed no vehicles moving through the intersection that would have obstructed Lundmark's path forward.

Although Sergeant Butcher pursued Lundmark's vehicle, activating his blue emergency lights to initiate a traffic stop, Lundmark did not pull over. Instead, he drove for about 25 seconds before stopping at a red light in the left-turn lane at the next intersection. Sergeant Butcher pulled behind Lundmark, got out of the cruiser, shined a flashlight at Lundmark's window, and knocked on his car while twice calling out "hello." When the left arrow turned green, however, Lundmark drove off. Sergeant Butcher returned to the cruiser and renewed the pursuit, this time activating the siren. Lundmark pulled over after completing the left turn.

When Lundmark lowered the driver's-side window as Butcher approached his car, Butcher "immediately smelled an odor of alcoholic beverages coming from [Lundmark's] person." Lundmark claimed to be "unaware" that Butcher had been trying to stop him. Lundmark "ha[d] red, watery eyes" and "slurred [his] speech." When Butcher asked Lundmark if he had been drinking, Lundmark first said no but then admitted to having "had [a couple] margaritas." Butcher radioed for a second unit to assist with a "DUI investigation."

Officer Brett Jennings arrived and took over the investigation. Lundmark admitted to consuming margaritas at a nearby restaurant for about two hours before driving home. He denied having any physical impairments or taking any medications that could affect his driving. Based on "pre-exit" field-sobriety tests, Jennings told Lundmark to get out of the car. After

---

[2] Butcher's body-camera video shows that Lundmark's vehicle remained stopped for about 12 seconds after the light turned green.

conducting other field-sobriety tests and a preliminary breath test, Jennings arrested Lundmark at 11:47 p.m.

Officer Jennings transported Lundmark to the police station for a breath test. Jennings, a licensed breath-test operator, followed Department of Forensic Science (DFS) procedures by observing Lundmark for 20 minutes before administering the test. Lundmark's hands remained secured behind his back the whole time. Although Jennings did not specifically inspect Lundmark's mouth before administering the breath test, as called for in the DFS manual, Lundmark did not appear to have anything in his mouth. Jennings had engaged in "a very lengthy" conversation with Lundmark while transporting him. And during that time, Lundmark did not consume any food or drink, did not "belch[,] burp[,] or vomit," and did not put his hands in his mouth. Officer Jennings took the breath sample at 12:27 a.m.; the resulting certificate of analysis showed that Lundmark had an alcohol content of 0.11 grams per 210 liters of breath, in excess of the 0.08 limit.

Lundmark moved to suppress the evidence, arguing that his temporary delay after the light turned green failed to provide reasonable, articulable suspicion for Sergeant Butcher to detain him. The trial court denied the motion.

Lundmark also moved *in limine* to exclude the certificate of analysis containing the breath-test results.[3] The trial court received the DFS instruction manual into evidence. The manual states that "[t]he operator should always inspect the subject's mouth for any foreign objects." Any foreign objects "should be removed," and "the subject must be observed for 20 minutes [before] providing a breath sample." Officer Jennings admitted that he had not checked Lundmark's "mouth for any contents visually" before the 20-minute observation period. The

---

[3] Rather than conduct a separate motions hearing, the parties agreed to litigate the motion to suppress and the motion *in limine* at the bench trial.

trial court denied the motion *in limine*, finding that Officer Jennings substantially complied with DFS's requirements.

The court convicted Lundmark of driving under the influence, in violation of Henrico County Code § 22-2(a) (which incorporates the requirements of Code § 18.2-266). Lundmark noted a timely appeal.

ANALYSIS

On appeal, Lundmark asserts that the trial court erred in denying his motion to suppress and his motion *in limine*.

*A. Motion to Suppress (Assignment of Error 1)*

A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo on appeal. *White v. Commonwealth*, 73 Va. App. 535, 552 (2021). But "[w]hile we are bound to review *de novo* the ultimate questions of reasonable suspicion and probable cause, we 'review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (second alteration in original) (footnote omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)).

"[A] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Mason v. Commonwealth*, 291 Va. 362, 367-68 (2016) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "To justify the traffic stop, an officer must have reasonable suspicion that the person stopped committed a crime or traffic violation." *Jones v. Commonwealth*, 71 Va. App. 375, 380

(2019). "Although a mere hunch does not create reasonable suspicion," a "'reasonable suspicion' requires only 'some minimal level of objective justification.'" *Mitchell v. Commonwealth*, 73 Va. App. 234, 246-47 (2021) (quoting *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016)). "The possibility that an officer ultimately may prove to be mistaken or that there may be an innocent explanation for the facts giving rise to the officer's suspicion does not negate, in and of itself, the officer's reasonable, articulable suspicion." *Id.* at 247.

We conclude that Sergeant Butcher had reasonable suspicion to believe that Lundmark had violated Code § 46.2-833(A). That statute provides that a green signal "indicates the traffic shall move in the direction of the signal and remain in motion as long as the green signal is given, except that such traffic shall yield to other vehicles and pedestrians lawfully within the intersection." Code § 46.2-833(A). A "driver of any motor vehicle may be detained or arrested for a violation of this section if the detaining law-enforcement officer is in uniform, displays his badge of authority, and . . . has observed the violation." Code § 46.2-833(D).

In *Joyce v. Commonwealth*, 72 Va. App. 9, 15 (2020), we held that a police officer had reasonable suspicion that Joyce violated Code § 46.2-833(A) when Joyce "remained motionless . . . for six or seven seconds" after the light turned green and the officer "did not observe any other vehicles in the intersection." We observed that failing to proceed when the signal is green is "not automatically a traffic violation"; rather, "some prolonged stops" might violate Code § 46.2-833 while "others will not." *Id.* at 15-16. But we emphasized that the possibility of an innocent explanation for not driving forward when the light turns green does not negate the reasonable suspicion that warrants stopping the driver. *Id.* at 16.

*Joyce* controls our decision here. Lundmark remained stopped at the green light for at least nine seconds—longer than the six seconds in *Joyce*. Butcher saw nothing in the intersection that would have obstructed Lundmark from driving forward. Like Joyce, Lundmark

insists that he was merely exercising "reasonable care" or caution. *Id.* at 15. But the mere possibility that Lundmark might have had an innocent explanation for not moving did not negate Butcher's reasonable suspicion that Lundmark had violated Code § 46.2-833(A). Thus, Sergeant Butcher could stop Lundmark's vehicle to investigate further. *Id.* at 16.

Lundmark's efforts to distinguish *Joyce* are unpersuasive. He claims to have faced more challenging driving conditions than Joyce, asserting that the intersection here was poorly lit, rural, and near wildlife, whereas Joyce drove through Bowling Green, Virginia, *see id.* at 12-13, which Lundmark assures us is "well lit, populated with landmarks, and much less likely to contain wildlife." But those facts are not supported by anything in the record here or in our opinion in *Joyce*. Moreover, Sergeant Butcher's body-camera video shows a clear intersection and overhead streetlights at each of the four corners of the intersection.

Lundmark claims that, unlike Joyce, his remaining stopped at the intersection did not impede any through-traffic. But impeding traffic is not an element of the offense under Code § 46.2-833. Lundmark did not need to block traffic for Sergeant Butcher to have formed reasonable suspicion that Lundmark violated the statute by remaining stopped at the green light.

Although Lundmark's apparent violation of Code § 46.2-833(A) alone provided reasonable suspicion for Butcher to stop Lundmark's car, that reasonable suspicion was magnified when Lundmark repeatedly ignored Butcher's signals to pull over. Lundmark was not seized within the meaning of the Fourth Amendment until he "actually *submitted*" to Sergeant Butcher's authority by stopping his vehicle. *Beasley v. Commonwealth*, 60 Va. App. 381, 392 (2012). "[B]y the time [he] was actually seized," *id.* at 395, Lundmark's behavior had grown even more suspicious. Lundmark failed to pull over despite that Butcher signaled him to do so by following him closely for about 25 seconds with his blue emergency lights activated. When Lundmark stopped in the left turn lane at the next traffic signal, Butcher got out of his car, shined

- 6 -

his flashlight into Lundmark's window, and knocked on Lundmark's car while calling "hello, hello." Yet Lundmark drove off when the light turned green, prompting Butcher to run back to his patrol car and resume the pursuit, this time with the siren on. Only then did Lundmark pull over.

"[W]hile headlong flight is not necessarily indicative of wrongdoing, it is a pertinent factor in determining reasonable suspicion." *Whitaker v. Commonwealth*, 279 Va. 268, 276 (2010). So is "an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence." *Middlebrooks v. Commonwealth*, 52 Va. App. 469, 479 (2008) (quoting *Commonwealth v. Thomas*, 23 Va. App. 598, 611 (1996)). Regardless of whether Lundmark intentionally evaded Butcher or was simply oblivious (perhaps due to intoxication) to Butcher's repeated, obvious signals to stop, an officer in Butcher's position could properly interpret Lundmark's behavior as suggestive of criminal activity. "These accumulating factors, in their totality, provided a reasonable, articulable suspicion that criminal activity was afoot . . . ." *Beasley*, 60 Va. App. at 397.

In short, the trial court did not err in denying the motion to suppress.[4]

*B. Motion in Limine (Assignment of Error 2)*

Lundmark argues that because Officer Jennings did not inspect his mouth for foreign objects as required by the DFS manual, the trial court should have excluded the breath-test results. "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Fitzgerald v.*

---

[4] Given our finding that Lundmark's detention was supported by reasonable suspicion, we need not address whether the stop was also supported by the community-caretaker doctrine. *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

*Commonwealth*, 61 Va. App. 279, 284 (2012). But the trial court's admissibility determination here rested partly on statutory interpretation, which we consider de novo. *Id.*

It is "unlawful for any person to drive . . . any motor vehicle . . . while such person has a blood alcohol concentration of . . . 0.08 grams or more per 210 liters of breath as indicated by a chemical test administered as provided in this article." Code § 18.2-266(i); Henrico Cnty. Code § 22-2(a) (adopting and incorporating Code § 18.2-266(i), among other provisions). For breath-test results to be admissible "as evidence in a prosecution under [Code] § 18.2-266," the test must have been conducted "in accordance with methods approved by" DFS. Code § 18.2-268.9(A).[5]

Those approved methods require that "[a]ll breath test devices shall be operated in accordance with . . . the [applicable] instructional manual." 6 Va. Admin. Code § 40-20-110(1). The DFS instructional manual, introduced into evidence here, states that "[t]he operator should always inspect the subject's mouth for any foreign objects." Department of Forensic Science, *Breath Test Operator Instructional Manual* 22 (2008). The Commonwealth conceded below that Officer Jennings did not specifically inspect Lundmark's mouth for such objects.

But the statutory requirements "relating to *taking*, handling, identifying, and disposing of blood or breath samples *are procedural and not substantive*." Code § 18.2-268.11 (emphasis added). "Substantial compliance shall be sufficient. Failure to comply with any steps or portions thereof shall not of itself be grounds for finding the defendant not guilty, but shall go to the weight of the evidence and shall be considered with all the evidence in the case . . . ." *Id.*

---

[5] Code § 18.2-268.9(A) also requires a licensed operator to conduct the breath test with equipment approved by DFS. The operator must issue a certificate indicating, among other things, "that the test was conducted in accordance with [DFS] specifications," as well as the "sample's alcohol content." Code § 18.2-268.9(B). The certificate itself is admissible in criminal proceedings if the prosecutor satisfies the notice requirements in Code § 19.2-187.1(A). *See* Code § 18.2-268.9(B)(i).

Again, "substantial compliance is sufficient for the admission of the test results." *Henry v. Commonwealth*, 44 Va. App. 702, 708 (2005); *see also Shelton v. Commonwealth*, 45 Va. App. 175, 180 (2005) ("We have even applied substantial compliance in cases where the statutory violation may have affected the reliability of the test results."); *Rollins v. Commonwealth*, 37 Va. App. 73, 80 (2001) ("[T]he legislature did not intend that strict compliance with the breath-test methods approved by [DFS] be a prerequisite for the admission into evidence of the results of a breath-analysis test. Substantial compliance with those methods is sufficient.").

"The burden is on the Commonwealth to show that it substantially complied with the requirements of the statute." *Fitzgerald*, 61 Va. App. at 291 (quoting *Snider v. Commonwealth*, 26 Va. App. 729, 732 (1998)). "[A] minor, trivial difference can be tolerated whereas a material difference cannot." *Rollins*, 37 Va. App. at 81 (quoting *Snider*, 26 Va. App. at 732). The substantial-compliance test "replace[s] the protective safeguards of specificity with a less exacting standard of elasticity, in order to achieve a beneficial and pragmatic result." *Id.* (quoting *Coleman v. Pross*, 219 Va. 143, 158 (1978)).

The trial court did not err in finding that Officer Jennings substantially complied with the procedural requirements for taking the breath test. The purpose of visually inspecting the subject's mouth is to ensure the absence of any foreign object that could cause an inaccurate result. *Breath Test Operator Instructional Manual*, *supra*, at 21-22. Lundmark has never asserted, and the evidence does not suggest, that he had a foreign object in his mouth before or during the breath test. Officer Jennings's testimony established that Lundmark's hands were handcuffed behind his back between his arrest at 11:47 p.m. and the breath test at 12:27 a.m. Lundmark did not eat or drink, did not put his hands in his mouth, and did not burp, belch, or vomit. Officer Jennings and Lundmark also spoke at length during the drive to the jail and while at the jail, so Officer Jennings likely would have noticed any foreign object in Lundmark's

mouth. Thus, Officer Jennings's failure to adhere to the manual's instruction that the officer should inspect the subject's mouth was a "minor" and "trivial" departure. *Rollins*, 37 Va. App. at 81.

We are also not persuaded by Lundmark's claim that the certificate of analysis constituted expert testimony, requiring the County to establish "the scientific validity" of the breath test as a condition of admissibility. "[T]o establish the certificate's admissibility," the Commonwealth needed to prove only that it complied with Code § 18.2-268.9, because "[w]hen the certificate contains what the statute requires, the statute makes the certificate self-authenticating for purposes of admissibility." *Fitzgerald*, 61 Va. App. at 286 (quoting *Stroupe v. Commonwealth*, 215 Va. 243, 245 (1974)). "Simply put, the statute does not require proof of the accuracy of an individual test as a prerequisite to admissibility of the resulting certificate." *Id.* at 289 (quoting *Woolridge v. Commonwealth*, 29 Va. App. 339, 345 (1999)).

The defendant must show a "substantive, rather than merely procedural, irregularity sufficient to defeat the certificate's admissibility." *Woolridge*, 29 Va. App. at 345. Lundmark failed to do that here. So the trial court did not abuse its discretion by admitting the certificate.

CONCLUSION

Sergeant Butcher had a reasonable, articulable suspicion for conducting the traffic stop, and Officer Jennings substantially complied with the DFS regulations for conducting the breath test. Thus, the trial court committed no error when it denied Lundmark's motion to suppress and his motion *in limine*.

*Affirmed.*